IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:14-CV-214-FL

| | | |
|---|---|---|
| ANTHONY NOBLES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| RODERICK BOYD; KEITH LARSEN; | ) | |
| and SOUTHERN INVESTIGATIVE | ) | |
| REPORTING FOUNDATION, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on plaintiff's motion for preliminary injunction, (DE 23), and defendants' motions to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil 12(b)(6), (DE 57), and to strike the complaint pursuant to California's statutory prohibition on strategic lawsuits against public participation (the "Anti-SLAPP statute"), Cal. Civ. Proc. Code §§ 425.16-.18, (DE 58). Also pending is plaintiff's motion to strike pursuant to Federal Rule of Civil Procedure 12(f), (DE 69), and motion for hearing. (DE 75).[1] In addition, plaintiff has made a part of his consolidated response a motion for leave to file an amended complaint, should the court be inclined to rule in defendants' favor. (DE 70). The issues raised have been briefed fully and in this posture are ripe for adjudication. For the reasons that follow, plaintiff's motion for preliminary injunction is denied, defendants' motion to dismiss is granted, and

---

[1] Where hearing would not materially advance the court's consideration of the issues presented, the court denies request for hearing.

defendants' Anti-SLAPP motion is denied as moot. Plaintiff's motion to strike, as well as plaintiff's request for leave to file an amended complaint, are denied.

## BACKGROUND

Plaintiff, an entrepreneur, inventor, and professor residing in California, initiated the instant suit on October 1, 2014. Plaintiff alleges defendant Southern Investigative Reporting Foundation ("SIRF"), a North Carolina corporation engaged in the business of investigative journalism with its principal place of business in Wilmington, North Carolina, as well as defendants Boyd, a member of defendant SIRF's board of directors and resident of North Carolina, and Larsen, an intern with SIRF who also is a resident of North Carolina, committed the torts of defamation; libel *per se*; and libel *per quod*, as well as violated the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, *et seq.*, through publication of an allegedly defamatory article regarding plaintiff's business ventures and academic credentials.

Plaintiff has had an accomplished career to date. He is listed as the inventor on more than 31 United States patents, has founded more than 28 companies, and has developed more than 155 medical devices, which have been sold or licensed to several major medical or pharmaceutical companies. (Compl., DE 13, ¶ 8-9).[2] As a result of his accomplishments, plaintiff has been invited to speak at numerous conferences and universities both in California and around the world. (Id. ¶¶13-14).

Plaintiff also has established himself as a philanthropist. Of note, plaintiff has provided financial support for numerous children's events throughout his community, provided "hundreds of

---

[2] Plaintiff filed a "corrected complaint" on October 2, 2014, to correct technical deficiencies in the original complaint, filed October 1, 2014. (DE 13). The corrected complaint does not change the substance of the original complaint.

thousands of dollars in capital and equipment to several hospitals and medical institutions in the United States and abroad", and has funded several scholarships or other educational opportunities for underprivileged youths. (Id. ¶¶ 17-20). Moreover, plaintiff has "used his significant assets such as his exotic car collection and aircraft to raise money and awareness for several charitable and public service groups" throughout southern California. (Id. ¶21).

Plaintiff first learned of the defendants SIRF and Boyd on September 8, 2014, when he received an email from defendant Boyd requesting an interview for an upcoming article to be published by SIRF. (Id. ¶28). Plaintiff declined the opportunity to interview, specifically noting that his schedule did not afford him the time to do so, but requested more information on defendants' proposed article. (Id. ¶29). On September 9, 2014, defendant Boyd responded to plaintiff's request for more information, stating that defendant Boyd, through defendant SIRF, would be releasing an article "within the week" that called into question plaintiff's academic credentials and highlighted complaints made by "investors in [plaintiff's] public and private ventures." (Id. ¶30). That same day, plaintiff received another email from defendant Boyd requesting information on litigation to which plaintiff was or is a party. (Id. ¶31).

On September 10, 2014, defendant Boyd again contacted plaintiff with an inquiry into the validity of plaintiff's academic credentials. (Id. ¶32). Subsequently, plaintiff again informed defendant Boyd that his schedule did not allow him the time to discuss defendant Boyd's inquiries immediately, but that he would be able to speak with defendant Boyd "the following Thursday," September 18, 2014. (See id. ¶ 33). On September 16, 2014, defendant SIRF published an allegedly defamatory article, available on its website, entitled *The Invention of Professor Dr. Anthony Nobles*, containing statements, which plaintiff contends belittle his accomplishments and damage his stature

3

in his community.  (Id. ¶24, 34-35).  Defendants Boyd and Larson are listed on the article's byline as its authors.  (Nobles Article, DE 13-1, at 2).

The article made 12 statements, which plaintiff alleges are defamatory falsehoods:

(1)  "Nobles used a combination of imagined and overstated credentials about his schooling, his teaching career, and his success as a entrepreneur to craft his greatest invention – the legend of himself as a medical technology renaissance man";

(2)  "So Anthony Nobles came up with what video game players call a 'cheat,' or a shortcut around an otherwise complex problem, like, for instance, a lack of the academic credentials that make investors comfortable with medical device entrepreneurs";

(3)  "The cost to Nobles for all of this ersatz educational experience?  According to federal prosecutors, $550 for a doctorate and 50% off for a second diploma, so figure about $825 in all";

(4)  "Note also the 16-year hiatus in conference attendance and research presentations;

(5)  "Investors would likely forgive Nobles' being a fabulist if he was able to generate a return on their capital";

(6)  In December of 2008 Sutura effectively wound down operations with Nobles buying (back) all Sutura's non-cash assets and $3 million in cash for $6.75 million";

(7)  "[I]n 2007 Sutura negotiated a $23 million settlement in a patent violation suit brought against Abbott Labs, [s]hortly after, according to the company's 2007 10-K annual report, $11.96 million in marketable securities were purchased at a point that year.  Who got custody of these assets is not clear";

(8) "Another investor, Croatian investor Bruno Mlinar, who met Nobles when both were in Europe racing Ferraris in 2008, gave Nobles $2.5 million for a stake in Nobles Medical Technology

and a new venture, Gyntlecare, after Nobles assured him that his company was going to be worth

over $150 million pending some Food and Drug Administration approvals";

(9) "He also received $435,000 in cash from one Karen Glassman at Gyntlecare";

(10) "For Mlinar, it gets worse in that Nobles also talked him into shipping him a Ferrari

worth what he claimed was $750,000 on the view that Nobles would use it as collateral for financing

(but somehow preserving Mlinar's ownership.)";

(11) "A better word for these people is 'investors' and with few exceptions, they appear to

be correct. Anthony Nobles has a storybook life yet, according to Southern Investigative Reporting

Foundation research, it appears most (if not all) of the capital he has raised has failed to earn a

return"; and

(12) "SIRF reached out to Anthony Nobles four times via phone . . . but no calls were

returned . . . SIRF did not ultimately secure an interview."

(Id. ¶¶26(1)-(12)).

After publishing the article, plaintiff alleges defendants went on a "smear campaign" by

contacting multiple people associated with plaintiff and supplying those individuals with either the

article or other false information solely for the purpose of harming plaintiff's reputation. (Id. ¶ 36).

On November 3, 2014, plaintiff filed a motion seeking a temporary restraining order and

preliminary injunction.[3] (DE 23). Therein, plaintiff seeks a court order mandating defendants

---

[3] In support of his motion for temporary restraining order and preliminary injunction, plaintiff filed a number of declarations. These include the declaration of: 1) John D. van Loben Sels, plaintiff's attorney (van Loben Sels Decl. 1, DE 25; van Loben Sels Decl. 2, DE 71); 2) plaintiff (Nobles Decl. 1, DE 26; Nobles Decl. 2, DE 72); 3) Richard Babcock, outside corporate counsel for plaintiff's current company Nobles Medical Technologies, II, and former counsel for a previous corporation, Sutura (Babcock Decl., DE 27); 4) Richard Bjorkman, Sutura's previous chief financial officer (Bjorkman Decl., DE 28); 5) Terry Giles, a sponsor for plaintiff's nomination for the Horatio Alger Award for Distinguished Americans (Giles Decl., DE 29); and 6) Karen Glassman, outside corporate counsel for Nobles Medical Technologies, II (Glassman Decl., DE 30);

remove the challenged article from the SIRF website and prohibiting defendants from publishing or making reference to the allegedly defamatory statements contained therein. On November 6, 2014, this court entered order denying plaintiff's motion insofar as it requested a temporary restraining order. (DE 50). The court concluded that plaintiff "ha[d] failed to show that the threatened irreparable harm [was] sufficiently immediate so as to warrant the extraordinary remedy of a temporary restraining order." (Id. at 3). However, the court held plaintiff's motion for preliminary injunction in abeyance pending further briefing. (Id. at 1, 3).

On December 9, 2014, defendants filed a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE 57). Contemporaneously therewith, defendants also filed a motion to strike plaintiff's complaint under California's Anti-SLAPP statute, (DE 58), and declarations of defendants Boyd and Larsen in support thereof. (DE 60, 61). In their motion to dismiss, defendants argue 1) the challenged statements are not defamatory; 2) the challenged statements are protected by the fair reporting privilege; and 3) that plaintiff is a public figure, or in the alternative a limited purpose public figure, and has failed to sufficiently plead malice, as required under long-standing Supreme Court precedent. The arguments made in furtherance of defendants' Anti-SLAPP motion largely are duplicative of those made in support of their motion to dismiss, where the Anti-SLAPP statute requires plaintiff demonstrate a likelihood of success on the merits of his case. On January 16, 2015, plaintiff filed an objection to those declarations. (DE 69).

# COURT'S DISCUSSION

A.    Plaintiff's Motion for Preliminary Injunction

Plaintiff moves the court for a preliminary injunction mandating defendants remove the challenged article from the SIRF website and prohibiting defendants from publishing or making reference to the allegedly defamatory statements contained therein.  (DE 23).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winters v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, plaintiff must establish four requirements: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in plaintiff's favor; and (4) that an injunction is in the public interest. Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 352, 346 (4th Cir. 2009), vacated on other grounds and remanded for further consideration, 559 U.S. 1089 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

For reasons discussed more fully below, in the context of the court's consideration of defendants' motion to dismiss, the court concludes plaintiff has failed to show a likelihood of success on the merits.  None of the statements cited by plaintiff are sufficient to state a claim for defamation under California law, which law, again for reasons set forth below, the court concludes must be applied.  Thus, plaintiff's motion for preliminary injunction is denied.

B.    Defendants' Motion to Dismiss

1.    Choice of Law

Before turning to the substance of defendants' motion, it is necessary to address the law applicable to this case.  The parties offer divergent theories on the matter.  Plaintiff contends that,

7

because defendants published the allegedly defamatory statement in North Carolina, the laws of this state should apply. On the other hand, defendants argue that the law of California applies to this case, because plaintiff is a resident of California and any harm done to his reputation was suffered in that state.

A federal district court sitting in diversity must apply the choice-of-law rules of the forum state. Kalxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941). In tort actions, North Carolina courts apply the rule of *lex loci delicti commissi* ("lex loci"), or the law of the place where the wrong was committed, to determine the applicable substantive law. Boudreau v. Baughman, 322 N.C. 331, 335 (1988); see also Harco Nat'l Ins. Co. v. Grant Thornton LLP, 206 N.C. App. 687, 692 (2010). This approach was adopted from the Restatement of Conflict of Laws ("First Restatement"). See Charnock v. Taylor, 223 N.C. 360, 362 (1943). See generally Restatement (First), Conflict of Laws, § 378.

Neither the North Carolina Supreme Court nor the Court of Appeals has had the opportunity to apply lex loci to multi-state publication of an allegedly defamatory statement. See Ascend Health Corp. v. Wells, No. 4:12-CV-83-BR, 2013 WL 1010589, at *2 (E.D.N.C. Mar. 14, 2013). Accordingly, as a court sitting in diversity, this court must predict how the North Carolina Supreme Court would rule on this matter. Wells v. Liddy, 186 F.3d 505, 527-28 (4th Cir. 1999); Liberty Mut. Ins. Co v. Triangle Indus., 957 F.2d 1153, 1156 (4th Cir. 1992) (holding that where state law is unclear federal courts must predict the decision of the state's highest court.).

Although at least 42 states have abandoned the traditional lex loci rule established by the First Restatement, see Peter Hay et al., Conflict of Laws § 2.16 (5th ed. 2010), North Carolina courts have evidenced a "strong adherence to the traditional application of the [lex loci] doctrine when

8

choice of law issues arise." <u>Mosqueda v. Mosqueda</u>, 218 N.C. App. 142, 150 (2012) (citing <u>Gbye v. Gbye</u>, 130 N.C. App. 585, 587 (1998)), <u>disc. rev. denied</u> 724 S.E.2d 919 (N.C. 2012). Thus, the court predicts that the North Carolina Supreme Court would continue its reliance on the First Restatement. <u>See, e.g.</u>, <u>Wells</u>, 2014 WL 1010589, at *2; <u>Hensley v. Nat'l Freight Transp., Inc.</u>,193 N.C. App. 561, 563 (2008) ("The law of the place where the injury occurs controls tort claims."), <u>aff'd</u> 363 N.C. 255 (2009) (per curiam).

Applying the First Restatement, the court holds that North Carolina courts would apply the law of the state of California. According to the First Restatement, the court applies the law of the forum where the wrong occurred. "The place of the wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place." Restatement (First), <u>supra</u>, § 377. "Where the harm is done to the reputation of a person, the place of the wrong is where the defamatory statement is communicated." <u>Id.</u> n.5. A defamatory statement is deemed "communicated" in the jurisdiction where the plaintiff's reputation is injured. <u>Id.</u> Illustration 7.[4]

In the case at bar, although plaintiff's complaint does not allege a specific state in which plaintiff's reputation suffered, plaintiff alleges he is a resident of California. (Compl. ¶1). In addition, although plaintiff alleges he is well-known throughout the United States, and indeed the world, (<u>Id.</u> ¶¶13-15), the majority of his professional connections are centered in California. (<u>See</u> <u>id.</u> ¶15) (noting speaking engagements at the University of California, Los Angeles; University of California, Los Angeles Harbor Medical Center; The University of Southern California School of Pharmacy; and Chapman University, all of which are located in California). Plaintiff further alleges

---

[4] The First Restatement provides, "A, broadcasting in state X, slanders B. B is well and favorably known in state Y and the broadcast is heard there by many people conversant with B's good repute. The place of the wrong is Y." Restatement (First), <u>Conflict of Laws</u>, § 377 Illustration 7.

9

substantial civic involvement, suggesting his reputation was damaged, in his community. (See id. ¶¶17-18, 20-22) (explaining plaintiff's substantial civil involvement and generous monetary contributions for community initiatives in California). Finally, the complaint suggests plaintiff's business ventures also are located in California, given the substantial connection to California evidenced in other areas of the complaint. (See id. ¶¶ 9, 12).

Plaintiff contends North Carolina law must apply to this case, because the place of publication, here North Carolina, not the place of harm, is the more logical "place where the defamatory statement [was] communicated." See Restatement (First), supra, § 377 n.5. In support of this argument plaintiff cites Wells v. Liddy, 186 F.3d 505 (4th Cir. 1999), a Fourth Circuit case applying Maryland's lex loci rule to a defamatory statement and determining that the law of the state in which the defamatory statement was made controlled. Id. at 522.

Wells is inapplicable to the instant case for a number of reasons. First, in Wells the defamatory statement was made in a speech at a Virginia university, was "never broadcast by any means[,] and was heard only by the audience at [the university.]" Id. This behind-closed-doors speech stands in stark contrast to the alleged defamatory statements at issue here. Defendants published the statements at issue in a newsletter, available worldwide on the internet. The potential audience for the statement was not definite and contained as a closed-door lecture would be. And, plaintiff does not argue the publication was targeted towards readers in North Carolina.

Moreover, the Fourth Circuit explicitly noted that "the Court of Appeals of Maryland [had] indicated its willingness to apply more flexible choice-of-law rules from the Second Restatement [of Conflict of Laws] in situations when the First Restatement rules have become unworkable," indicating a gradual shift away from the lex loci rule on behalf of that court. Id. at 528. North

Carolina courts, however, have been hesitant to reject application of the lex loci rule set out by the First Restatement.  See Boudreau, 322 N.C. at 335 (1988); Mosqueda, 218 N.C. App. at 150, disc. rev. denied 724 S.E.2d 919 (N.C. 2012).  Thus, application of the First Restatement compels the application of California law to plaintiff's claims.  See Restatement (First), supra, § 377 Illustration 7.

2.       Sufficiency of Plaintiff's Complaint – Defamation and Libel

Defendants first contend plaintiff's complaint must be dismissed because it fails to state a claim for libel under California law.  In California libel is defined by statute as "a false and unprivileged publication by writing, . . ., or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Civ. Code § 45.[5]  To state a claim under § 45, plaintiff must allege "[1] a publication that is [2] false, [3] defamatory, and [4] unprivileged, and that [5] has a natural tendency to injure or that causes special damages." Taus v. Loftus, 40 Cal. 4th 683, 720 (2007).

a.       Capable of Defamatory Meaning

Defendants first argue that the challenged statements are not "defamatory." A defamatory statement is one that is "capable of [a] defamatory meaning." Mellen v. Times-Mirror Co., 167 Cal. 587, 593 (1914); see also Smith v. Maldonado, 72 Cal. App. 4th 637, 645 (1999).  Whether a statement is capable of defamatory meaning is a question of law for the court.  Baker v. Los Angeles Herald Examiner, 42 Cal. 3d 254, 260 (1986).  A statement may not be defamatory for a

---

[5]  Libel is further separated into libel *per se* and libel *per quod*.  The California Civil Code recognizes this distinction in section 45a, which defines libel per se as a statement "which is defamatory to the plaintiff without the necessity of explanatory matter," but notes that libel *per quod* requires plaintiff to plead and prove "special damage as a proximate result" of the libel.  Cal. Civ. Code § 45a.

number of reasons. Principally, a statement is not defamatory where it is not capable of impugning plaintiff's reputation or where it is a statement of opinion. See Troy Grp., Inc. v. Tilson, 364 F. Supp. 2d 1149, 1155 (C.D. Cal. 2005) (discussing statements not capable of defamatory meaning); Baker, 42 Cal. 3d at 260 ("The crucial question in this case is whether the statement at issue was a statement of fact or a statement of opinion.").

To determine whether a statement is capable of defamatory meaning, the court examines the publication from the standpoint of the average reader, "not . . . by its effect when subjected to the critical analysis of a mind trained in the law." MacLeod, 52 Cal. 2d at 550-51. The defamatory nature of the statement must be apparent from the totality of the circumstances, including the language employed and context in which the statement appears. See Balzaga v. Fox News Network, LLC, 173 Cal. App. 4th 1325, 1337-38 (2009); Monterey Plaza Hotel v. Hotel Employees & Restaurant Employees, 69 Cal. App. 4th 1057, 1064-65 (1999); Morningstar, Inc. v. Super. Ct., 23 Cal. App. 4th 676, 686-94 (1994); Moyer v. Amador Valley J. Union High Sch. Dist., 225 Cal. App. 3d 720, 724-25 (1990). If words are not plainly defamatory, but rather are susceptible to both a defamatory and innocent interpretation, plaintiff may plead specifically facts demonstrating that the words, when read by their targeted audience, were understood as defamatory, a concept known in California as "innuendo." Washer v. Bank of America, 21 Cal. 2d 822, 828 (1943) disagreed with on other grounds MacLeod, 52 Cal. 2d 536 (1959).

After a review of plaintiff's complaint and allegedly defamatory article attached thereto, the court holds that several of the challenged statements are not susceptible to defamatory meaning. Understood from the standpoint of the "average reader," these statements cannot be understood to reflect negatively on plaintiff's reputation.

For example, plaintiff contends the statement "The cost to [plaintiff] for all of this ersatz educational experience? According to federal prosecutors, $550 for a doctorate and 50% off for a second diploma, so figure about $825 all in" is defamatory. (See Compl. ¶26(3); Nobles Article, at 5). It is not. Plaintiff suggests this statement conveys that he was the subject of a federal investigation, but California law instructs that this statement must be considered in context. So considered, plaintiff's suggestion must fail. The article, on the same page and in the preceding paragraph, notes that the referenced federal investigation was into the educational institutions from which plaintiff received his advanced degrees. (Nobles Article, at 5 (stating that "both schools have fallen on hard times, with federal prosecutors charging James Enowitch, the Connecticut man who founded both Redding and Glendale, with mail fraud" immediately prior to reference to a federal investigation)). This context forecloses plaintiff's proffered interpretation of that statement.

Plaintiff also contends that the statement "Note also the 16-year hiatus in conference attendance and research presentations" is defamatory. (See Compl. ¶ 26(4); Nobles Article, at 8). To the limited extent this statement can be read as ambiguous "innuendo," plaintiff fails to plead facts suggesting that the words, when read by their targeted audience, were understood as defamatory. See MacLeod, 52 Cal. 2d at 550 (noting that where allegedly defamatory statements are ambiguous on their face, plaintiff must plead "inducement," or additional facts, to show the statements are defamatory because of the "extrinsic facts known to the reader"); Barnes-Hind, Inc. v. Super. Ct., 181 Cal. App. 3d 377, 387 (1986) (same); cf Megarry v. Norton, 137 Cal. App. 2d 581, 583 (1955) (noting no need to plead innuendo or inducement where defamatory meaning is evident on the face of the statement).

13

Where plaintiff contends an ambiguous statement may be characterized as defamatory, it is incumbent upon plaintiff to 1) plead innuendo, or ascribe a defamatory meaning to the statement, and 2) plead inducement, or offer facts showing that the reader to whom the allegedly defamatory article was published would understand it in that defamatory sense. <u>Barnes-Hind</u>, 181 Cal. App. 3d at 387 (quoting 5 Witkin, Cal. Proc. § 690 (3d ed. 1985)); <u>see also</u> 5 Witkin, Cal. Proc. §§ 741-42 (5th ed. 2008) (discussing innuendo and inducement pleading requirements). Although plaintiff argues the statement implies his credentials as a scientist lack merit, he does not allege any facts to support the inference that the common reader to whom defendants targeted their publication would have understood such statements to convey that meaning.

The statements "In December of 2008 [plaintiff's company] effectively wound down operations with Nobles buying (back) all . . . non-cash assets and $3 million in cash for $6.75 million," and "in 2007 [plaintiff's company] negotiated a $23 million settlement in a patent violation law suit brought against Abbott Labs, Shortly [sic] after, according to the company's 2007 10-K annual report, $11.96 million in marketable securities were purchased at a point that year. Who got custody of the assets is not clear," are not capable of defamatory meaning. (Compl. ¶¶26(6) & (7); Nobles Article, at 10). The plain meaning of paragraphs 26(6) and 26(7) does nothing to "injure [plaintiff] in his occupation" or reflect negatively on his personal character. Cal. Civ. Code § 45. Rather, these statements merely convey the substance of two business transactions.

Although the article details the hard times onto which plaintiff's company fell, there is nothing defamatory about stating that, after his company's collapse, plaintiff purchased its assets. The article contains no charge, either explicit or implicit, that plaintiff received an improper or illegal benefit through the course of his purchase. Moreover, even though plaintiff argues that the

14

article suggests he received approximately $12,000,000 from the settlement of a patent law suit, that suggestion, on its face, does not reflect negatively on plaintiff.

At least two additional statements cited by plaintiff, paragraphs 26(8) and 26(10), only loosely refer to plaintiff. In any event, these statements also are not capable of defamatory meaning. Paragraph 26(8) provides that "Croatian investor Bruno Mlinar, who met [plaintiff] when both were in Europe racing Ferraris in 2008, gave [plaintiff] $2.5 million for a stake in Nobles Medical Technology and a new venture, Gyntlecare, after Nobles assured him that his company was going to be worth over $150 million pending some Food and Drug Administration approvals." (Compl. ¶26(8)). The other challenged statement provides that "[f]or Mlinar, it gets worse in that Nobles also talked him into shipping him a Ferrari worth what he claimed was $750,000 on the view that Nobles would use it as collateral for financing (but somehow preserving Mlinar's ownership.)." (Id. ¶26(10)).

The first of these statements does nothing to damage plaintiff's reputation. It merely relays the substance of a business transaction between plaintiff and an investor. Plaintiff's allegations challenging the second statement fair no better, for the same reasons. Moreover, to the limited extent these statements can be read as ambiguous "innuendo," plaintiff again fails to plead an "inducement" sufficient to support that conclusion. See MacLeod, 52 Cal. 2d at 550 (noting that where allegedly defamatory statements are ambiguous on their face, plaintiff must plead "inducement," or additional facts, to show the statements are defamatory because of the "extrinsic facts known to the reader"); Barnes-Hind, 181 Cal. App. 3d at 387. Plaintiff neither pleads proposed defamatory construction of these statements nor alleges why the common reader to whom

15

defendants targeted their publication would have understood such statements to impugn his character.

Finally, paragraph 26(12) alleges that the statement "SIRF reached out to [plaintiff] four times via phone . . . but no calls were returned. . . . SIRF did not ultimately secure an interview" is defamatory. This statement cannot be read to lower plaintiff in the estimation of his community. While plaintiff suggests this statement frames him aloof or evasive, the court's conclusion that this statement cannot be read as defamatory is buttressed by the article's next paragraph, which indicates that defendant Boyd reached out to plaintiff through electronic mail, and that such communications were "moderately successful." (Nobles Article, at 11).

In sum, paragraphs 26(3), 26(4), 26(6), 26(7), 26(8), 26(10), and 26(12) are not capable of defamatory meaning and thus, are insufficient to provide the basis for a defamation claim. Plaintiff's defamation and libel claims are dismissed to the extent they rest on these allegations.

     b.     Statement of Opinion

Defendants contend paragraphs 26(1), 26(2), and 26(11) must be dismissed because they are non-actionable statements of opinion. For the reasons that follow, the court agrees.

As an initial matter, the court must address the law applicable to defendants' opinion argument. Although the court previously has determined California law governs plaintiff's defamation claims, the court's analysis now must also include considerations of federal law, because the requirement that an alleged defamatory statement be of fact, rather than opinion, flows from the First Amendment. See generally Milkovich v. Lorain J. Co., 497 U.S. 1 (1990). Thus, the Fourth Circuit's interpretation of the First Amendment controls. Va. Soc. for Human Life, Inc. v. Fed. Election Comm'n, 263 F.3d 379, 393 (4th Cir. 2001), overruling on other grounds by intervening

Supreme Court precedent recognized by The Real Truth About Abortion, Inc. v. Fed. Election Comm'n, 681 F.3d 544, 550 n.2 (4th Cir. 2012); see also United States v. Glaser, 14 F.3d 1213, 1216 (7th Cir. 1994) ("Nothing the [E]ighth [C]ircuit decides is 'binding' on district court's outside its territory. Opinions 'bind' only within a vertical hierarchy.").

"The sine qua non of recovery for defamation . . . is the existence of falsehood. Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 283 (1974). Accordingly, a defamation action cannot lie where the challenged statements are statements of opinion, which are not capable of being proven either true or false. See Gertz v. Robert Welch, Inc. 418 U.S. 323, 339-40 (1974); see also Biospherics, Inc. v. Forbes, 151 F.3d 180, 184 (4th Cir. 1998) (noting courts must examine "the [challenged] statement's language and context to determine if it could be interpreted as asserting a fact."). Whether a statement is one of actionable fact is a question of law to be decided by this court. Biospherics, 151 F.3d at 184-86 (analyzing fact versus opinion as a matter of law).

A statement of opinion is one that expresses a subjective view, divorced from implicit assertion of objective fact. See Snyder v. Phelps, 580 F.3d 206, 218 (4th Cir. 2009) ("[T]he First Amendment will fully protect statements that cannot reasonably be interpreted as stating actual facts about an individual." (internal alterations and citations omitted)); Partington v. Bugliosi, 56 F.3d 1147, 1153 (9th Cir. 1995) ("[O]ne must analyze a statement in its broad context to determine whether it implies the assertion of an objective fact."). To determine whether a statement is one of fact or opinion courts consider whether the language used is "loose, figurative, or hyperbolic," as well as the "general tenor of the article." Biospherics, 151 F.3d at 184.

In Biospherics, the Fourth Circuit laid out a framework for evaluating a statement as actionable fact. With regard to the first inquiry, the tenor of the language used, the court stated that

17

irreverent and indefinite language may negate an impression that the writer is stating fact. Id. 184-85. With regard to the second inquiry, into the "general tenor of the article," the court noted that articles that "reflect[] the writer's subjective and speculative supposition," were unlikely to be actionable fact. Id. at 184. Moreover, the court indicated that, when a defendant-writer draws a conclusion, but discloses the facts underlying that conclusion, and the plaintiff does not challenge the accuracy of those underlying facts, "no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related." Id. at 185 (quoting Chapin v. Knight-Ridder, 993 F.2d 1087, 1093 (4th Cir. 1993)); accord Phantom Touring, Inc. v. Affiliated Publ'ns, 953 F.2d 724, 730-31 (1st Cir. 1992) (when statement provides factual bases for its conclusion, it is a "personal conclusion" rather than a statement of fact subject to a defamation claim). With these principles in mind, the court turns to the challenged statements.

Paragraphs 26(1) and 26(2) contain similar allegations regarding plaintiff's education and credentials. In particular paragraph 26(1) calls into question the statement "What follows are the broad strokes of how [plaintiff] used a combination of imagined and overstated credentials about his schooling, his teaching career, and his success as an entrepreneur to craft his greatest invention - - the legend of himself as a medical technology renaissance man." (Compl. ¶26(1); Nobles Article, at 3). In similar fashion, paragraph 26(2) states that "[Plaintiff] came up with that video game players call a 'cheat,' or a shortcut around an otherwise complex problem, like, for instance, a lack of the academic credentials that make investors comfortable with medical device entrepreneurs." (Compl. ¶26(2); Nobles Article, at 4).

With regard to the tenor of the language employed by the author, the first statement openly admits that it is a broad analysis of how plaintiff "craft[ed] . . . himself as a medical technology

renaissance man." The use of the word "craft[ed]," as well as the statement "medical technology renaissance man," bespeak an irreverent, rather than a defamatory, tone to the article. With regard to the second sentence, the use of a video game analogy indicates a similar, irreverent tone. This tone works to negate the impression the writer is stating fact.

With respect to the "general tenor" of the article, these statements, when viewed in context, are not actionable fact. In particular, both statements appear to impugn plaintiff's credentials, including his doctoral degrees. However, the article highlights that plaintiff "claimed to have earned two Ph.D.'s, both in Biomedical Engineering, from Glendale and Redding Universities," and then goes on to claim that Glendale and Redding Universities are mail-order institutions, whereby a student can "give [the schools] [the student's] credit card number and . . . instantly have a degree in most anything." (Nobles Article, at 4-5). Notably plaintiff does not challenge the truth of these statements. Accordingly, defendants' statements regarding plaintiff's credentials are nothing more than conclusions drawn from facts unchallenged by the complaint. Thus, "no reasonable reader" would consider these statements anything but the opinion of the author "drawn from the circumstances related." Biosphereics, 151 F.3d at 185.

Paragraph 26(11) warrants the same conclusion. Therein, defendants state "[Plaintiff] has a storybook life yet, according to [defendant SIRF's] research, it appears most (if not all) of the capital he has raised has failed to earn a return." (Compl. ¶26(11); Nobles Article, at 3). With respect to the "general tenor" of the statement, read in context with the remainder of the article the language used indicates that defendants' statement is an opinion formed based on available evidence. In particular, the article provides that "based on the available evidence, it would appear that" plaintiff's business ventures rarely earn a return. (Nobles Article, at 9). Thereafter, defendants

19

go on to detail a series of business transactions that resulted in lost profits, to which plaintiff raises no objection. Although defendants' statements convey that plaintiff's business ventures always fail to generate a return for investors, the language "based on the available evidence" and "it appears" used later in the article softens the blow of this statement. Accordingly, paragraph 26(11) states an opinion drawn from evidence, which is provided from the reader. Under these circumstances, "no reasonable reader" could conclude the statement is one of actionable fact. <u>Biospherics</u>, 151 F.3d at 185.

Finally, the statement "Investors would likely forgive [plaintiff's] being a fabulist if he was able to generate a return on their capital," (Compl. ¶26(5); Nobles Article, at 9), is a statement of opinion. This statement blends together opinions regarding plaintiff's education, insofar as it calls plaintiff a "fabulist," and his prowess as a businessman. As discussed above, however, both of these notions do not constitute actionable statements of fact because defendants sufficiently couch them as conclusions drawn from evidence, to which plaintiff raises no objection.

In sum, paragraphs 26(1), 26(2), 26(5), and 26(11) are not actionable as statements of opinion and thus, are insufficient to provide the basis for any defamation claim. Accordingly, the complaint is dismissed to the extent it rests on these allegations.

           c.      Of and Concerning Plaintiff

Defendants next contend paragraph 26(9) is not "of and concerning" plaintiff. For the reasons stated below, the court agrees.

For an alleged defamatory statement to be actionable in tort, it must be "of and concerning" the plaintiff, meaning it must refer to plaintiff. <u>Williams v. Seiglitz</u>, 186 Cal. 767, 768 (1921). The requirement that the statement refer to plaintiff derives directly from the First Amendment.

Rosenblatt v. Baer, 383 U.S. 75, 83 (1966); Blatty v. N.Y. Times Co., 42 Cal. 3d 1033, 1043 (1986).

Paragraph 26(9) states that "[Croatian investor Bruno Mlinar] also received $435,000 in cash for one

Karen Glassman at Gyntlecare, [one of plaintiff's companies.]" (Compl. ¶26(9); Nobles Article, at

11). This statement comes amid a number of statements discussing plaintiff's business dealings with

Mlinar, and Mlinar's alleged unhappiness with their result. (See generally Nobles Article, at 11).

However, the statement itself is not actionable where it does not refer to any actions taken by

plaintiff.[6] Thus, to the extent plaintiff's complaint rests on paragraph 26(9), defendants' motion to

dismiss is granted.

In sum, none of the statements alleged by plaintiff to be defamatory falsehoods are of such

a character that a libel action may accrue therefrom. Accordingly, defendants' motion insofar as it

seeks dismissal of plaintiff's claims for 1) defamation; 2) libel *per se;* and 3) libel *per quod* is

granted.

3.      North Carolina Unfair and Deceptive Trade Practices Act

Defendants also move to dismiss plaintiff's claim alleging violation of the UDTPA, arguing

the statute is inapplicable because North Carolina law does not apply to this case. The court agrees.

Although the North Carolina Supreme Court has yet to address the appropriate choice-of-law rule

applicable under the UDTPA, the Fourth Circuit has noted that North Carolina's courts would apply

the lex loci rule, as in tort cases. ITCO Corp. v. Michelin Tire Corp., 772 F.2d 42, 49 n.11 (4th Cir.

1983). As noted previously, plaintiff suffered injury in California only. Thus, the UDTPA cannot

---

[6] To the limited extent this statement can be read as impugning Nobles by reference to Karen Glassman, outside corporate counsel for plaintiff's business ventures, including Gyntlecare, the court concludes that this statement, read in context, is not capable of defamatory meaning.

apply to this case.  Thus, defendants' motion to dismiss plaintiff's fourth cause of action alleging violations of the UDTPA also is granted.

Plaintiff requests that the court grant him leave to amend, rather than granting defendants' motion to dismiss outright.[7]  An amendment may be denied as futile if the proposed amendment "is clearly insufficient or frivolous on its face." Johnson v. Oroweat Foods, 785 F.2d 503, 510 (4th Cir. 1986) (citing Davis v. Piper Aircraft Corp, 615 F.2d 606, 613 (4th Cir. 1980)).  "[I]f the underlying facts or circumstances relied upon by a [party] may be a proper subject for relief, he ought to be afforded an opportunity to test his claims on the merits." Foman v. Davis, 371 U.S. 178, 182 (1962).  However, if the party "advances a claim . . . that is legally insufficient" there is no reason to allow the amendment.  See Joyner v. Abbot Labs., 674 F. Supp. 185, 190 (E.D.N.C. 1987).

In evaluating a proposed amendment for futility, the court views the facts pleaded in the light most favorable to plaintiff.  Flood v. New Hanover Cnty., 125 F.3d 249, 251 (4th Cir. 1997).  An amendment is futile if it would not survive a motion to dismiss.  Perkins v. United States, 55 F.3d 910, 917 (4th Cir. 1995).  Because plaintiff's allegations are insufficient to state a claim upon which relief can be granted, plaintiff's request for leave to amend is denied as futile.

C.      Defendants' Motion to Strike Under California's Anti-SLAPP Statute

Defendants also move to dismiss the complaint under California's Anti-SLAPP statute, Cal. Civ. Proc. Code §§ 425.16-.18.  (DE 58).  Assuming, without deciding, that the Anti-SLAPP statute applies in this litigation, defendants' motion must be denied as moot.

California's Anti-SLAPP statute provides immunity to defendants embroiled in lawsuits that could potentially chill public participation in the exercise of free speech. Cal.  Civ.  Proc.  Code §

---

[7] No proposed amendment followed this request, included in plaintiff's responsive brief.

425.16; U.S. *ex rel* Newsham v. Lockheed Missiles & Space Co., 190 F.3d 963, 973 (9th Cir. 1999).

Where applicable, analysis of the Anti-SLAPP statute proceeds first with the burden on defendant to "make a prima facie showing that the . . . suit arises from any act" that is "in furtherance of the [defendant's] right of petition or free speech . . . in connection with a public issue. Id. (citing Cal. Civ. Proc. Code § 526.16(b)(1)). Once defendant makes such threshold showing, the burden shifts to plaintiff to demonstrate "that there is a probability that [he] will prevail on the claim." Cal. Civ. Proc. Code § 425.16(b)(1). When a federal court analyzes an Anti-SLAPP motion grounded in "alleged deficiencies in the plaintiff's complaint" the motion "must be treated in the same manner as a motion under [Federal Rule of Civil Procedure] 12(b)(6)." Rogers v. Home Shopping Network, Inc., 57 F. Supp. 2d 973, 983 (C.D. Cal. 1999). Here, where the court already has resolved defendants' motion to dismiss in their favor, defendants' Anti-SLAPP motion is denied as moot.

With respect to plaintiff's objection to certain portions of defendants Boyd and Larsen's declarations, the court construes such objection as a motion to strike, made pursuant to Federal Rule of Civil Procedure 12(f). In his motion to strike, plaintiff argues that a large number of the statements contained therein are irrelevant or otherwise may not be considered properly by the court. Where the court's resolution of defendants' motion to dismiss does not require reference to these documents, and because the court has denied defendant's motion to strike the complaint under California's Anti-SLAPP statute as moot, the court also denies plaintiff's motion to strike as moot. (DE 69).

## CONCLUSION

In its discretion, for reasons noted, plaintiff's motion for hearing, (DE 75), is DENIED. Based on the foregoing, plaintiff's motion for preliminary injunction, (DE 23), is DENIED.

Defendants' motion to dismiss for failure to state a claim (DE 57), is GRANTED. Defendants' motion to strike the complaint under California's Anti-SLAPP statute, (DE 58), is DENIED as MOOT. Plaintiff's objection to defendants Boyd and Larsen's declarations, (DE 69), is CONSTRUED as a motion to strike pursuant to Federal Rule of Civil Procedure 12(f), and such motion is DENIED as MOOT. Plaintiff's veiled request for leave to amend is DENIED. (DE 70). The clerk is DIRECTED to close this case.

       SO ORDERED, this the 7th day of May, 2015.


_____
LOUISE W. FLANAGAN
United States District Judge